UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DENNIS MICHAEL MINTUN,<br><br>    Plaintiff,<br><br>vs.<br><br>CORIZON HEALTH, INC., SELAH<br>WORLEY, GEN BREWER, and<br>RONA SIEGERT,<br><br>    Defendants. | Case No. 1: 21-cv-00124-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

Plaintiff Dennis Michael Mintun is a prisoner in custody of the Idaho Department of Correction (IDOC). He is proceeding on his prisoner civil rights complaint asserting that he suffers from serious ongoing back pain with "potential weakening," "possible loss of eyesight," loss of use of his left thumb and wrist in his day-to-day activities, and serious pain in his left ankle. Dkt. 3, p. 2. Plaintiff asserts that Defendants ignored and refused to treat these conditions properly. Plaintiff is proceeding on Eighth Amendment and related state law supplemental jurisdiction claims against two prison health care providers—Corizon Nurse Practitioner Selah Worley and IDOC Health Services Director Rona Siegert.

Worley and Siegert have filed a Motion for Summary Judgment. Dkt. 27-1. Plaintiff has filed a Response and a "Rebuttal to Reply" (an unauthorized sur-reply).

Dkts. 29, 31. The Court has reviewed both. For the sake of judicial efficiency, the Court will not address every point Plaintiff makes in his Response and Rebuttal. Those points not addressed have been considered and rejected. For the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment.

CONSTITUTIONAL CLAIMS

### 1.  Standards of Law

Summary judgment is appropriate when a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id*. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, a party may cite to particular parts of the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court does not determine the credibility of affiants or weigh the evidence. Although all reasonable inferences that can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from strict compliance with the summary judgment rules," but not "from all compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. A plaintiff must show that he is "incarcerated under conditions posing a substantial risk of serious harm" as a result of Defendants' actions—which is analyzed under an objective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal punctuation omitted). The objective standard means that the prisoner's medical needs must be serious, "[b]ecause society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

A plaintiff must also bring forward facts showing that Defendants' state of mind was that of deliberate indifference to his medical condition—analyzed under a subjective standard. A plaintiff must show that the official knew of but recklessly disregarded an excessive risk to the plaintiff's health, which means that, in the course of treating or refusing to treat the plaintiff, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and must actually "draw the inference." *Farmer*, 511 U.S. at 837. Medical negligence or malpractice alone will not support a claim for relief under the Eighth Amendment, *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980), because such actions are not an abuse of governmental

power, but rather a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Differences in judgment between an inmate and a prison medical provider about appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Even differences of medical opinion between medical providers "cannot support a claim of deliberate indifference." *Toguchi v. Chung*, 391 F.3d 1051, 1059-1060 (9th Cir. 2004) (citation omitted). Rather, to be able to proceed to a jury trial, a plaintiff must present plausible facts  from which a jury could find "that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Id*. at 1058.

### 2.   Summary of Ruling

For the reasons that follow, the Court will grant Defendants summary judgment on the merits of the claims, but deny summary judgment on the statute of limitations defense. The medical records and medical provider declarations and opinions show that Plaintiff has received adequate care under the Eighth Amendment. The totality of the record also shows that Plaintiff has insufficient evidence to show that Defendants committed medical malpractice or negligence.

Plaintiff has back pain that allows him to plays softball and work in the library during the day, but that prevents him from being able to find a tolerable sleeping position at night. X-rays show that he has large osteophytes and significant disc narrowing in his lumbar spine. However, the record also reflects that he has not been compliant with

medical providers' requirements that he lose weight and perform back- and core-strengthening exercises *either* to improve his condition *or* to qualify for an MRI and potential surgery if his condition is not improved. Medical advice to lose weight is not simply a suggestion, but is a part of a conservative treatment plan for back pain.

Corizon Regional Medical Director Sandra Zakroff, M.D., reviewed Plaintiff's medical records and noted that surgeons regularly decline to perform spinal surgeries on morbidly obese individuals. There is no evidence in the record to the contrary. Neither Plaintiff's disagreement with his medical providers about his conservative course of treatment for back pain nor his refusal and/or inability to follow medical providers' advice amounts to deliberate difference on the part of Defendants.

The Court has also reviewed a large number of medical records related to Plaintiff's claims of a watery eye when chewing, left ankle pain, and left wrist/thumb pain. The records show that Defendant Worley and other medical providers were not deliberately indifferent to these conditions, but worked steadily to diagnose and provide different types of conservative care, taking into consideration his other serious medical conditions. The records show that Defendant Siegert reviewed Plaintiff's medical care multiple times to ensure that he was, in fact, receiving adequate care; that she obtained further expert advice when needed; and that she advised Plaintiff accordingly. Defendants operated within the Corizon/IDOC prison medical care system, which was something less than a "well-oiled machine," but not so far from what people in the community receive when they try to access health care. Because the care Plaintiff received does not equate to

cruel and unusual punishment, both Defendants are entitled to summary judgment on Plaintiff's other claims.

### 3. Discovery Dispute

Earlier in this matter, Plaintiff asserted that Defendants had not provided him with all relevant records. The Court ordered Defendants to produce additional records. Defendants filed a Notice of Compliance with exhibits. Dkt. 33. In response, Plaintiff filed a Notice of Noncompliance. Dkt. 34. Having reviewed the records and the notices, the Court concludes that no further records are available to be produced, including MRI reports, x-ray reports, or nursing records in the form that Plaintiff has requested. For that reason, Plaintiff's request for a special master to aid with discovery disputes will be denied. Dkt. 37, p. 3.

In any event, additional records would not change the outcome of the summary judgment motion. For example, the x-ray of the bone spur pressing on the left Achilles tendon is not necessary, because the medical records reflect that the practitioners were aware of that condition. Nursing records documenting Plaintiff's past weight are unnecessary because Plaintiff admits that he has always been overweight and that he gained a significant amount of weight during the COVID-19 pandemic. See Dkt. 29, pp. 5-6, Plaintiff's Affidavit.

Regarding Defendants' representations about the difficulty of obtaining prisoner medical records, the Court agrees with Plaintiff that, due to the nature of Rona Siegert's job duties as a high level medical oversight administrator employed by IDOC who reviews past and present IDOC prisoner medical records to monitor prisoner medical care

when grievances are filed, she necessarily must have access to such records, regardless of who the current contracted medical provider is. If Siegert did not have such access, she could not perform her oversight duties, as set forth in her Declaration. Regardless, the Court is satisfied that the large number of past and present records obtained through Defendants' counsel is sufficient to determine the pending summary judgment motion.

### 4.   Plaintiff's Request for Appointment of an Expert

Plaintiff has asked for appointment of an independent medical examiner as an expert witness to counter the medical opinions of the treating and reviewing providers in the record. Dkt. 29, p. 5. Under Federal Rule of Evidence 706, the court may appoint an expert witness in a factually or legally complex case. The cost of such an expert may be allocated between the parties or may be allocated to a single party. *See* Fed. R. Civ. P. 706(b); *McKinney v. Anderson*, 924 F.2d 1500, 1511 (9th Cir.), *vacated and remanded on other grounds*, 361 502 U.S. 903 (1991).

The purpose of a court-appointed expert is to assist the trier of fact. *Gorrell v. Sneath*, 2013 WL 3357646, * 1 (E.D. Cal. Jul. 3, 2013). Courts are not permitted to invoke Rule 706 simply to "appoint an expert on behalf of an indigent civil party," *Woodroffe v. Oregon*, 2014 WL 1383400, at *5 (D. Or. April 8, 2014), to act as an advocate for the plaintiff, *Manriquez v. Huchins*, 2012 WL 5880431, *14 (E.D. Cal. 2012), or to counter bias, *Brooks v. Tate*, 2013 WL 4049043, *1 (E.D. Cal. Aug. 7, 2013).

Here, the Court concludes that the constitutional claims are not so factually or legally complex that a neutral expert is required. The objective facts are clear from the extensive medical records. The Eighth Amendment standard is very high and cannot be met by a prisoner who disagrees with providers' reasonable decisions to exhaust conservative methods of treatment (back, ankle, and wrist/thumb issues) or to forgo further testing when a prior diagnosis as to a relatively nonserious condition is evident (a conservatively-treated case of a watering eye during chewing that resulted from a past case of Bell's palsy).

Disagreements between medical providers, as well as disagreements between a medical provider and a patient, are not enough to show deliberate indifference under the Eighth Amendment, and therefore such disagreements do not require another expert's opinion to resolve. There are insufficient facts in the record to show a genuine dispute of material fact as to Defendants' subjective state of mind. The facts do not present a jury issue as to whether the chosen courses of treatment were medically unacceptable under the circumstances of this particular case or were chosen in conscious disregard of an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058.

For all of these reasons, the Court declines to appoint a Rule 706 expert for any of Plaintiff's claims.

**5.  Statute of Limitations Defense**

Defendants assert that some of Plaintiff's claims are beyond the two-year statute of limitations. Plaintiff filed his Complaint in this action on March 16, 2021, which means that his earliest claims cannot be older than March 16, 2019.

Plaintiff's allegations pertaining to his eye began on or about September 16, 2018. *See* Dkt. 23, p. 4, Declaration of NP Selah Worley. Defendants assert that Plaintiff first complained of his current increased bout of back pain in February 2018. *Id.*, p. 16. While these complaints clearly are outside the range of the statute of limitations, Plaintiff's later complaints for the same conditions certainly are within the range. Plaintiff's grievances show that he exhausted his administrative remedies for his eye and back condition issues related to these two Defendants.

On February 24, 2020, Plaintiff filed a grievance about his eye condition, complaining of Worley's lack of treatment; Siegert was the appellate responder. Dkt. 29, pp. 27-28. On January 5, 2021, Plaintiff filed a grievance regarding Worley's failure to provide any pain medication for his back problems, including scoliosis, degenerated discs, and serious bone spurs. Dkt. 29, pp. 31-32. He suggested running tests, providing surgery, or providing narcotic pain medication as a solution. On February 11, 2021, Siegert responded to the grievance by saying she would check with Dr. Zakroff to review Plaintiff's case and determine if additional diagnostic testing and/or medication was indicated. *Id.*, p. 32.

These complaints and grievances about the eye and back conditions are sufficient to defeat Defendants' statute of limitations defense for their roles in Plaintiff's treatment

within two years of the date he filed his Complaint. While Plaintiff cannot reach back to 2018, Worley and Siegert denied him the treatments of his choice for the same medical conditions within the statute of limitations period, and he can proceed against them on these later claims.

### 6.  Roles of Defendants in Plaintiff's Health Care

Defendant Selah Worley is a nurse practitioner who provides medical care to prisoners, including Plaintiff, via her employment with the prison's contracted health care provider, then Corizon Medical Services, Inc. Other practitioners also provided medical care to Plaintiff during the same time period, and this Order notes when Worley was not the provider associated with care for Plaintiff's health complaints. Plaintiff asserts that Worley did not provide him with constitutionally-adequate health care.

Defendant Rona Siegert is the IDOC Health Services Director. Although she is a registered nurse, she currently is not a health care provider. Her job consists of reviewing, investigating, and responding to health care grievances. She is the highest level appellate authority in the IDOC prison grievance system; however, she does not have authority to override or change the decisions of physicians, physician's assistants, or nurse practitioners. If she has questions during her investigation, she refers them to medical staff or the medical company's Regional Medical Director, in this instance, Dr. Sandra Zakroff. See Dkt. 27-5, p. 2.

While the Court agrees with Defendant Siegert that she did not necessarily have a duty to review and respond to inmate grievances "in a particular way," the Court

concludes that the IDOC charged her with the duty to review a prisoner's health issue, review his medical records, and determine whether additional investigation was needed—because the IDOC is ultimately responsible for a prisoner's health care, even though the details may be delegated to a private medical company. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (holding that indifference may be shown when a prison official fails to respond to a prisoner's pain or denies medical treatment"); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 243 (D. Mass. 2012) (observing that a "prison official is a proper defendant in an Eighth Amendment suit if that official was 'personally involved' in the decision to deny treatment for Plaintiff's serious medical need. Personal involvement may be established 'by showing that the official knew of the prisoner's need for medical care and yet failed to provide the same.'"). In this case, Siegert certainly could be held liable if she perceived from a grievance that a prisoner was receiving improper medical care for an unresolved serious condition or injury and she did nothing on behalf of the IDOC in response to the inmate grievance.

On the other hand, Siegert cannot be held liable for any alleged constitutional violation that she did not participate in but only reviewed after the fact. As one court has explained, where defendants' "only roles in [a civil rights] action involve the denial of administrative grievances [when the alleged civil rights violation occurred in the past], ... they cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Plaintiff asserts that Siegert did not follow through on alleged treatment plans and did not handle his grievances in an appropriate way. Because the chronology of treatment

and the care given by nondefendant providers are especially important to the analysis of Siegert's role in Plaintiff's health care, analysis of the claims against her are intermixed with a review of Plaintiff's course of treatment by Defendant Worley and by other nondefendant providers, rather than in a separate section of this Order. Analysis of Worley's role in Plaintiff's medical care is found at the end of each of the four sections addressing each of his particular medical complaints.

### 7. Eighth Amendment - Back Condition

Plaintiff has had ongoing back pain for many years. On November 9, 2006, a prison doctor ordered x-rays of Plaintiff's lumbar spine, thoracic spine, and sacroiliac joints. These x-rays, read by Milroy Emmanuel, M.D., showed early degenerative arthritic changes, but no other abnormalities; the intervertebral disc spaces were well-maintained and the pedicles were intact. *See Case 1:06-cv-00139-BLW, Mintun v. Blades,* Dkt. 71, p. 27.

By May 2018, twelve years after the x-rays and three years prior to filing the present lawsuit, imaging of Plaintiff's back showed significant changes often associated with increased pain:

> T-spine: impression: unchanged kyphoscoliosis and degenerative disc changes at t9-10 and t10-11 with huge unchanged bridging osteophytes at t11-12 and t12-l1.

> L-spine: impression: lumbar scoliosis, concave right, with large buttressing osteophytes t12 through l2 with lesser osteophytosis at all other levels.

> Moderate disc narrowing at l3-4 and moderately severe at l4-5.

Dkt. 27-4, p. 17.

Prison medical providers tried various medications to address Plaintiff's low back pain. When they tried medications that can be prescribed either for mood disorders or pain management, Plaintiff refused to take them because he perceived that they made him feel angry and agitated. Plaintiff generally refers to those medications as "psych meds."

For example, on June 18, 2019, a nurse noted in Plaintiff's records that he had failed to appear for two doses of his cymbalta medication ("a psych med"). Dkt. 27-4, p. 34. On June 23, 2019, a nurse noted in Plaintiff's records that he had failed to appear for two doses of his duloxetine medication ("a psych med"). *Id.*

On July 1, 2019, Plaintiff reported bothersome back pain at night to Nurse Practitioner William Rogers during a medical appointment. Dkt. 23-3, p. 73. Plaintiff said he did not have relief with cymbalta; however, he did not take it routinely for 4-6 weeks as advised because he became "leery of psych meds after discussing this with his family." *Id*. He reported being "up and active throughout the day" and that he continued to play softball." *Id*. He also reported "APAP" (acetaminophen/Tylenol) "initially helps his discomfort but then the pain is worse after it wears off." *Id*. Rogers decided to try Plaintiff on a low dosage of amitriptyline (Elavil) ("a psych med"), and educated him about trying new medications for a longer term to obtain some benefit. *Id*. On July 9, 2019, a nurse noted in Plaintiff's records that he had failed to appear for two doses of his Elavil medication. *Id*.

On August 1, 2019, Plaintiff saw Registered Nurse Amanda Johnson at sick call. He reported: "Back pain worsening – severe. Either need another surgery or an effective

pain killer." *Id.*, p. 33. Plaintiff reported that he had less pain when active, but pain now caused sleeping issues, and the pain brought him to tears at night. *Id.* Johnson noted that Plaintiff was already on meloxicam (Mobic), scheduled an appointment for him, and advised him to return to sick call if needed. Plaintiff declined a muscle rub or APAP offered to him on that date. *Id.*

On September 1, 2019, Plaintiff saw Nurse Practitioner Rex Underwood and reported that amitriptyline/duloxetine did not work for his pain, but meloxicam did help. Rogers prescribed tramadol (a synthetic opioid) for pain on a temporary basis, renewed the meloxicam, and advised Plaintiff to do strengthening and use ice. *Id.*, p. 31. Rogers wrote that he would like to prescribe prednisone, but he would not, because of Plaintiff's high blood pressure. *Id.*, p. 31. Rogers also reported that Plaintiff could no longer have "keep on person" medications because of "poor adherence to medication." *Id.*

Three days later, on September 4, 2019, Plaintiff filed a grievance complaining that the medical clinic had been "[t]aking over a month to see me regarding on-going back pain, when I was given medicine for pain that did not work, and no follow-up was conducted." Dkt. 27-6, p. 2. He asserted that he should be seen "right away to be sure pain meds work," and that "since my back problems are on-going and documented, should be on a regular follow-up schedule." *Id.* On appellate review, he emphasized that the prior grievance responses do not address his "complaint of continuous long delays – nor does it provider a satisfactory remedy." *Id.*, p. 3.

As the record above reflects, Plaintiff had been seen in the health clinic for back pain and his medication had been changed just three days before he filed the grievance.

On October 1, 2019, Siegert responded as the final appellate authority by stating that the IDOC and Corizon were aware of the appointment delays and were working to resolve the issue. She explained to Plaintiff that because chronic back pain was not treated in the chronic care clinic, he could not have a regularly-recurring appointment, and therefore he must continue to use the HSR (Health Service Request) form and sick call process at the prison. Dkt. 27-6, p. 3.

Plaintiff is not entitled to an optimal medical scheduling system in prison. Despite Plaintiff's requests for system-generated appointments rather than self-made appointments, the record reflects that Plaintiff knew how to use the HSR system and regularly obtained medical care. After his September 1, 2019, appointment for back pain, Plaintiff was seen in the medical unit eight times over the next twelve weeks as a result of his use of the HSR process. Nothing in the record shows he could not have raised the back pain medication issue during these visits if he was in severe pain, especially given that some of his appointments were for pain in other areas of his body. He was seen for ankle pain on September 16, 2019, October 9, 2019, November 1, 2019, and November 10, 2019; for hypertension on October 14, 2019; for an eye issue on October 21, 2019, at which time the provider noted that Plaintiff said that he "was previously on long-term prednisone for back pain up until this spring and feels [symptoms] have steadily worsened since this was tapered off though is unsure"; and for back pain on November 22, 2019 (after having submitted an HSR for worsening back pain on November 9, 2019). Dkt. 23-3, p. 69; Dkt. 27-4, pp. 28-30.

MEMORANDUM DECISION AND ORDER - 15

Plaintiff has provided insufficient evidence to show that Siegert was responsible for or personally involved in the delays complained of in the grievance. Plaintiff's problem did not need urgent intervention, and he was seen in the health clinic an average of every 10.5 days from September through November. Plaintiff has not met either the objective or subjective element of a deliberate indifference claim against Siegert, who has a very limited role in the prison health care system—checking on the status of medical treatment for health conditions specified in prisoner grievances. She is entitled to summary judgment on this grievance response claim.

On October 3, 2019, Plaintiff submitted another grievance: "Underwood stated he'd schedule a follow up for back pain meds, as we were not sure they'd work – no follow up was scheduled, and I'm told I'd have to submit another HSR, and wait for weeks in severe pain. This is the 3rd time this has happened." Dkt. 27-6, p. 6. Plaintiff's suggested solution was: "Automatic follow up for person receiving new meds – especially when given 'psych' meds for pain. This would make sure they work so no side effects. In my case, I request an immediate appointment." *Id*.

The first level grievance response was that, "[a]s in the community, appointments must be scheduled and requested per patient's request." *Id*. The second level grievance response was that "Provider Underwood placed you on tramadol [an opioid] for 30 days" and that Plaintiff should use the HSR process *Id*.

At the appellate level, Siegert wrote: "Often times, even in the community, follow up visits are not scheduled until the patient chooses to make an appointment. Once you receive a referral in sick call your wait for an appointment should be no more than 14

days." Dkt. 27-6, p. 7. Even if Nurse Practitioner Underwood said he was going to make Plaintiff a medication follow-up appointment but did not, Siegert has no liability for Underwood's omission, and the grievance did not present an emergency. Plaintiff has not met the subjective element of a deliberate indifference claim against Siegert. She is entitled to summary judgment on this grievance response claim.

Plaintiff submitted another grievance on November 13, 2019, asserting that Nurse Practitioner Underwood requested an MRI for him but Corizon denied it; he asked that a new MRI be scheduled. All levels of grievance responders stated that the medical records showed *no* MRI request. The second level, dated November 27, 2019, noted that Plaintiff had recently been placed on gabapentin for back pain (November 22, 2019, appointment discussed below).

On appeal, Siegert responded on December 27, 2019, saying that Underwood may have intended to, but did not, order an MRI. Siegert encouraged Plaintiff to discuss an MRI with the provider again. She also provided an alternative explanation for Underwood's omission, stating that Underwood likely was preoccupied on that date with Plaintiff's critically elevated blood pressure. Plaintiff has not shown deliberate indifference arising from Siegert's handling of this grievance for an MRI. The medical records did not reflect that an MRI had been intended or ordered, and, in fact, the record reflected that practitioners were in the process of trying different medications for Plaintiff's back pain. Siegert is entitled to summary judgment on her actions in handling this grievance because there is no evidence supporting the objective or subjective elements of deliberate indifference.

MEMORANDUM DECISION AND ORDER - 17

As noted above, in the midst of various providers responding to Plaintiff's grievance about Nurse Practitioner Underwood's failure to schedule an MRI, Plaintiff had an appointment with Defendant Worley on November 22, 2019, where he complained of "back pain laying down not controlled with Mobic [meloxicam] and Tylenol." *Id*., p. 28. Worley prescribed gabapentin and meloxicam and recommended stretching daily, increasing physical activity, and losing weight. *Id*.

On August 31, 2020, Nurse Practitioner William Rogers performed a records review for Plaintiff's complaints of increased back pain (not an in-person evaluation due to a COVID-19 quarantine), noted Plaintiff's 2018 diagnoses, noted his recent 30-pound weight gain, and recommended weight loss and spinal conditioning (in-cell exercises). Dkt. 27-4, pp. 17-18. Rogers prescribed naproxen and encouraged use of NSAIDs. *Id*., p. 18.

On October 28, 2020, Rogers again saw Plaintiff, who reported that the naproxen has been fairly helpful for his back pain. Plaintiff declined an AAOS spinal handout. Rogers recommended continuation of conservative pain management, recommending that Plaintiff work on his weight, stretching, and strengthening his core. Dkt. 27-4, pp. 15-16.

On December 17, 2020, Plaintiff had a "periodic physical exam" with Worley. The entire body systems were discussed, with Worley emphasizing the importance of making lifestyle changes to decrease his blood pressure, including weight loss, a heart-healthy diet, daily regular exercise, reducing sodium, and reducing stress. A discussion of back pain is not included in the record for this visit. Dkt. 27-4, pp. 13-14.

MEMORANDUM DECISION AND ORDER - 18

On December 22, 2020, Plaintiff had another appointment with Worley, this time for ongoing back pain. Worley entered the following in Plaintiff's chart: "Patient states 'I don't want any psych meds because they make be crazy and violent and that's not good to have happen in here.'" Dkt. 27-4, p. 12. She reported that he said, "All I want is a real pain medication to take at night." *Id*. Worley told him that opioids are not a first line recommendation in managing chronic pain. He stated that he already knew he needed to lose weight, because all the physician's assistants had been telling him to lose weight. When Worley attempted to discuss recommendations of weight loss, not ordering unhealthy commissary items, and changing his diet, she and Plaintiff had a disagreement. *Id*.

On January 5, 2021, Plaintiff filed a grievance to complain that Worley would not give him narcotic pain medication to be able to sleep at night, and would not run tests and recommend surgery for him. Dkt. 27-6, p. 19. Plaintiff said that Worley "says my only problem is that I am fat, and offered me (for the sixth time) a print of exercise[s] – which I have too much pain to do!" *Id*.

At the appellate level, Siegert responded to the grievance as follows:

> I'm sorry you continue to have back pain. The MRI and different pain medication that you are asking for can only be ordered by a medical provider. So I have asked the Corizon regional medical director, Dr. Zakroff to review your case and determine if additional diagnostic testing and or medication is indicated.

Dkt. 27-6, p. 19. This is an appropriate response to the grievance. Siegert recognized that a serious problem was presented, and she went to the highest level to obtain direction. Dr.

MEMORANDUM DECISION AND ORDER - 19

Zakroff recommended weight loss and adopting a healthy lifestyle before moving away from conservative treatment. It is unclear whether Siegert communicated this opinion to Plaintiff, but even if she did not, that omission does not equate to deliberate indifference in providing medical care for Plaintiff's back, because Siegert performed her primary duty, to evaluate whether the inmate was receiving adequate medical treatment.[1] Siegert is entitled to summary judgment for her action on this grievance.

On January 23, 2021, Rex Underwood entered a prescription for imipramine ("a psych med") for Plaintiff's pain. Dkt. 27-4, p. 11. On February 22, 2021, William Rogers entered the following in Plaintiff's record: "doesn't want antidepressant for pain. I'VE REPEATEDLY TOLD PROVIDERS NOT TO GIVE ME PSYCH MEDS - ESPECIALLY ANTIDEPRESSANTS, AS THEY CAUSE ANGER AGITATION - PLEASE CANCEL THE IMIPRAMINE – IT CAUSES AGITATION AND RINGING IN MY EARS." Dkt. 27-4, p. 9. On that date, Plaintiff reported that he had stopped taking imipramine two weeks earlier and requested that it be discontinued. Rogers recommended working on weight loss to improve chronic pain. Dkt. 23-3, p. 50.

On March 12, 2021, Plaintiff filed a grievance stating that he wanted a note placed in his file indicating that providers should not prescribe "psych meds – especially antidepressants for pain" because those medications make him angry and agitated. Dkt.

---

[1] It is unclear from the record whether anyone communicated Dr. Zakroff's opinion to Plaintiff or it was placed in his medical records. The Zakroff opinion is found in an email between Siegert and Zakroff. See Dkt. 27-5, p. 9: "(Exhibit B is a true and correct copy of my email correspondence with Dr. Zakroff regarding Mr. Mintun in February 2021. I consider this a business record kept in the ordinary course of business through my job.)."

27-6, p. 20. At the appellate level of the grievance, Siegert wrote: "Your request to have specific documentation put in your medical record can only be done by a medical or mental provider. Please address this issue with a provider." *Id*., p. 21.

There is nothing inappropriate about the way Siegert handled this request. While later providers may have missed earlier chart notes that other providers had made that Plaintiff did not want "psych meds" for pain control,[2] each made new notes to that effect in Plaintiff's charts for future reference. Providers also may have seen the notes but may have been trying *different* "psych meds," hoping to find one that did not have the negative side effects. Nothing Plaintiff has presented shows that Siegert had authority to enter notes about medication preferences into a patient's medical records, or that she responded with deliberate indifference by telling Plaintiff that she did not have authority to do so. This ends the analysis of Plaintiff's claims against Siegert for Eighth Amendment deliberate indifference to his back pain condition and related issues; in summary, Siegert is entitled to summary judgment on each grievance claim.

Continuing with the final bit of the chronological care Worley provided to Plaintiff related to his back pain issues, the Court notes that, on May 7, 2021, Plaintiff had an appointment with Worley, where they discussed Plaintiff's back and left wrist pain and a recent trial medication, naproxen, which Plaintiff reported worked for sciatica but not his back pain. Dkt. 27-4, p. 7. Plaintiff complains that Worley did not examine his back, but Worley's extensive notes show a reasonable explanation for that: "Back exam not

---

2

obtained due to allow additional time to review and discuss pain management." *Id*.

During this appointment, Worley wrote: "recommending orthopedic evaluation LUE [left

upper extremity] due to worsening symptoms, decreased ROM, increased pain, how has

failed conservative management." *Id*. Though not for his back pain issue, this note shows

that Worley was willing to recommend further interventions if conservative treatment

was unsuccessful.

Based on the foregoing, the Court concludes as follows as to Worley's care of

Plaintiff's back pain condition. To summarize Plaintiff's position, the Court notes that

between 2019 and 2021, he alleges that Defendant Worley failed to treat a recent increase

in back pain that caused him to be unable to find a comfortable position to sleep at night.

He asked for an MRI diagnostic test, surgery, and/or narcotic pain medication. His

position is that "psych meds," used off-label for pain management, are inappropriate for

him because of negative mood-altering side effects. Plaintiff admits that he has always

had a weight problem and a back problem. He says that he "did gain a great deal of

weight in 2020, due to both the COVID lock-down, and Prednisone treatments." Dkt. 29,

p. 3. At the time of his requests for an MRI and surgery, he weighed over 300 pounds,

*Id*., p. 6.

A summary of Defendant Worley's position is that (1) Plaintiff is a 60-year-old

morbidly obese individual with a body mass index of over 40; (2) he has chief

comorbidities of hypertension, hyperlipidemia, and Diabetes Type II (3) Plaintiff's

weight is a significant contributing factor to his chronic pain; (4) numerous medical

provides have advised him to lose weight to reduce his chronic pain; and (5) Plaintiff

refuses to accept and act on the medical advice to lose weight to reduce his chronic pain.

*See* Defendants' Statement of Undisputed Facts ¶¶ 3, 10, 12.

Supporting Worley's position is Corizon's regional medical director, Dr. Sandra Zakroff, who reviewed Plaintiff's medical records and opined:

> Reviewing his chart, I am not sure that there is much else to do. It is documented: Patient today requesting "all I want is a real pain medication to take at night." Patient states "I don't want any psych meds because they make be crazy and violent and that's not good to have happen in here." Patient not able to verbalize what he considers as psych meds that he has trialed in the past.
>
> He has been trialed and offered a wide variety of nonnarcotic pain meds. It is not recommended to use narcotics for chronic pain so I would suggest that we not go down that path. I understand that he is only asking for a bedtime dose, but that is the way it starts and over time the use escalates and then at some point it is no longer helpful.
>
> He has also refused appointments. Certainly, his weight is not helping his situation. His x-rays do show large osteophytes. However, given his weight that impacts on how good of a surgical candidate he would be or if surgery would even help him. I am not sure that any neurosurgeon would want to do a surgery as it would be elective. Additionally, if he would benefit from surgery I would anticipate the neurosurgeon would want to see him lose weight prior to the surgery. The only reason to get the MRI is if we are anticipating referring to neurosurgery.

Dkt. 27-7, p. 2.

Dr. Zakroff's written evaluation shows that narcotics (opioids) are not indicated for chronic pain in prison, or outside of prison, for that matter, because even if patients attempt to take the medication only at night, the use escalates *and* the drugs become less effective over time. Narcotics, therefore, are not a viable option for a chronic condition.

MEMORANDUM DECISION AND ORDER - 23

It is unfortunate that Plaintiff finds that antidepressant medications otherwise regularly used for pain control make him feel angry and agitated, but that does not transform Worley's refusal to prescribe narcotics or her attempt to prescribe alternative medications for pain into cruel and unusual punishment. Plaintiff's inability to find relief within a smaller set of non-narcotic, non-"psych med" pain medication further demonstrates that a different conservative treatment path is indicated in his particular situation—to lose weight, try to regularly perform the correct core- and back-strengthening exercises as soon as reasonably possible. Should Plaintiff decide to follow the advice of his many providers, one of two new paths will open: the combination of weight loss and exercise may reduce the back pain, or the combination will prepare him to be a better candidate for an MRI and surgery.

The extensive medical records documenting Plaintiff's overall physical health and his back treatment show that Defendant Worley and many of the other providers had an objectively good reason for their similar recommendations, and that reason is shared by Dr. Zakroff. There does not seem to be a dispute that Plaintiff suffers from pain at night that disrupts his sleep, nor does there seem to be a dispute among providers that weight loss and exercise are the next necessary steps on the conservative pain management path. Plaintiff has not submitted an affidavit from a medical provider countering Dr. Zakroff's opinion that it would be difficult if not impossible to find a surgeon willing to perform surgery unless Plaintiff first loses weight. As noted above, there are too many medical opinions in the record that support Worley for the Court to consider appointing an independent medical expert on this claim.

MEMORANDUM DECISION AND ORDER - 24

Plaintiff argues that Worley is not entitled to summary judgment because many times she did not actually examine his back. Dkt. 29, p. 9. However, Worley's point of view that additional imaging is not indicated and weight loss is an essential next step in Plaintiff's pain management plan is supported by Dr. Zakroff. Importantly, Dr. Zakroff's opinion is based on a comprehensive review of records and factors, including the weight factor.

*In Ballinger v. Bright*, the district court rejected a claim similar to Plaintiff's:

> In Dr. Bright's opinion, an examination by an orthopedic specialist for knee replacement surgery and a new M.R.I. are not medically necessary because in light of plaintiff's morbid obesity the knee pain and immobility need to be addressed by weight loss and exercise, and another surgery would not help. Plaintiff believes that the proper course of treatment is for him to get a new M.R.I. examination and to be seen by an orthopedic specialist for knee replacement surgery.

> "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1058-60. In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Id.* at 1058.

> There is no evidence from which a reasonable fact-finder could find that the course of treatment Dr. Bright's chose was medically unacceptable under the circumstances. In light of plaintiff's obesity, Dr. Bright's opinion that he should address his knee pain and mobility with weight loss and exercise is

> not only sensible but corroborated by the doctor who
> examined him.

*Id.*, No. C 15-1576 WHA (PR), 2016 WL 3345309, at *2-3 (N.D. Cal. June 16, 2016).

On May 18, 2020, a prison physical therapist noted that Plaintiff's core strength was only "fair," given that he was unable to hold a "table top" position for more than five seconds. Dkt. 27-4, p. 22. As to Plaintiff's assertions that back- and core-strengthening exercises will not significantly reduce his back pain, he has no medical opinion to support that position. There is no evidence in the record that Worley can create a different set of exercises for an obese patient that will be as effective in combatting back pain as the ones she has prescribed combined with the weight loss she has recommended. Plaintiff has reported that he is on the right track toward taking responsibility for his health issues by developing his own routine of low-impact exercises that he does, including 100 incline pushups per day and resistance band stretches. *Id.*, p. 3. While exercise may not significantly reduce his pain, either alone or in combination with weight loss, exercise and weight loss appear to be the end of the conservative treatment path and may open the door to an MRI and surgery if a severe level of pain persists.

Like Plaintiff, many people in modern society have no willpower to lose weight, even though they know that doing so would vastly improve their health. However, because the legal standard here is cruel and unusual punishment, Plaintiff's failure to follow the advice of his medical providers is the factor that shows he cannot meet the elements of objective or subjective deliberate indifference to proceed to a jury trial. There is no deliberate indifference when an inmate refuses to accept or act on medical advice.

"[D]eliberate noncompliance . . . does not convert the consequences that flow automatically from that noncompliance into punishment," reasoned the United States Court of Appeals for the Seventh Circuit in *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005).

As an example of Plaintiff's noncompliance, Defendants have submitted Plaintiff's commissary purchase list for the time period at issue. Plaintiff supplements his prison main-line or healthy-choice diet (both designed with the proper caloric intake for male adults) with items not recommended by health providers: bacon, summer sausage, cheese, tortillas, Cheez Its crackers, Whoppers, cheese puffs, butter popcorn, mayonnaise, hot cocoa, orange soda, root beer, Coke, Maria's cookies, ramen soup, iced Honey Buns, peanut butter, salted peanuts, Reese's peanut butter cups, Moon Pies, Swiss Rolls, Hershey's chocolate, M&Ms, and other candy. Dkt. 27-4, pp. 76-98.[3]

As in *Ballinger,* the record reflects that Dr. Zakroff's opinion supports Worley's decisionmaking about not pursuing an MRI and a surgery option until Plaintiff makes some strides in losing weight, which will either significantly alleviate his back pain or make him a candidate for back surgery. The record does not show that Worley was subjectively or objectively deliberately indifferent to Plaintiff's back problems.

For all of the foregoing reasons, Defendants Worley and Siegert are entitled to summary judgment on the back pain claims.

---

[3] It is unclear why the prison allows prisoners to purchase unlimited amounts of unhealthy commissary items, knowing that taxpayers must foot the bill for prisoners' attendant health problems that might be at least partially resolved by healthy eating habits.

### 8.  Eighth Amendment –  Ankle and Foot Issues

Plaintiff had several problems with his ankles and left foot. Medical providers, including Worley, worked to sort them out and address them—with the most urgent needs being addressed first. Plaintiff had temporary swelling due to a left ankle softball injury. He also had a bone spur on his heel, which some providers thought might be causing microtears to his Achilles tendon. From time to time, he had edema (swelling) in both legs, most likely caused by his hypertension. He also is morbidly obese, which put extra pressure on his ankles and feet.

Plaintiff alleges that Worley should have done more to treat his softball injury. He says that Worley "caus[ed] pain from torn Achilles tendon to last many months," that she claimed that the pain was caused by arthritis without conducting any tests or examinations, and that she unnecessarily prolonged his left ankle pain by claiming it was caused by "weight and arthritis," rather than recommending other tests. Dkt. 3, p. 3. As noted above, Plaintiff states that another provider and the physical therapist told Plaintiff that the cause of his ankle pain was a bone spur that caused "microtears" in the tendon, as opposed to weight and arthritis.

In her declaration, Worley provides a history of Plaintiff's ankle issues beginning in August 2019, including treatment by other providers. She did not treat him for ankle issues until December 2019.

On August 15, 2019, Plaintiff submitted an HSR complaining that he hurt his ankle playing softball. Dkt. 23-4, p. 58. Nurse Amanda Johnson received the HSR and noted that Plaintiff would be scheduled with a practitioner for a consultation. *Id*.

MEMORANDUM DECISION AND ORDER - 28

On September 12, 2019, almost a month later, Plaintiff filed a grievance stating that he had another delay in treatment—this time for his ankle, and that his ankle injury may have worsened because he had been walking on it. He mentioned that the only provider scheduled to work on his ankle-injury appointment date had called in sick, which caused further delay, and that perhaps Corizon should schedule more than one provider each day. Dkt. 27-6, p. 4.

On September 16, 2019, Nurse Practitioner William Rogers diagnosed Plaintiff with a left ankle sprain/strain. Dkt. 27-4, p. 31. Plaintiff's ankle appeared normal, with full range of motion and without crepitus, bruising, or swelling. However, Plaintiff had edema in both legs. Rogers prescribed compression stockings for edema and wrote "conservative management for ankle pain – trial compression stockings and get some fluid out of LE's and see if this will improve his ankle discomfort." *Id.*

On September 29, 2019, Plaintiff submitted another HSR, noting that his left ankle injury was worsening rather than getting better. He reported that it hurt the most when he had been walking for a while. Dkt. 23-4, p. 57.

On October 2, 2019, Siegert, as the appellate authority, responded to Plaintiff's grievance appeal. She told Plaintiff that, four days after he submitted the grievance, his ankle was evaluated in the medical unit, and, at that time, the provider determined that compression socks were necessary for bilateral edema. The provider chose not to otherwise treat the left ankle at that time but to allow it to self-heal and have a follow-up. Siegert said that he would be scheduled within the first two weeks of October to follow-

up on the ankle issue, and that he should discuss his worsening symptoms with the provider at that time.

Clearly, Siegert evaluated the grievance appeal well after the delay had been addressed by medical staff. She appropriately concluded that Plaintiff needed follow-up care and that he would have an upcoming appointment, which, in fact, he did. Nothing in the manner in which Siegert evaluated and addressed the grievance shows that Plaintiff can meet either the objective or subjective element of deliberate indifference as to her particular duties and responsive action.

On October 9, 2019, Plaintiff again saw Rogers for increased left ankle pain. Rogers noted that Plaintiff's gait favored his left ankle, and the left ankle looked normal, with some limited but adequate range of motion, and with the posterior ankle tender to palpitation. Plaintiff was not wearing his compression socks. Rogers ordered an ankle x-ray, an ankle sleeve, and in-house meals for seven days. Dkt. 27-4, p. 29.

On November 10, 2019, Plaintiff saw Physician's Assistant Anthony Bushnell, who told Plaintiff that his x-ray showed a larger blunt Achilles heel spur and arthritis, "but otherwise negative left ankle." Dkt. 27-4, p. 28. Plaintiff had full range of motion in his ankle, no crepitus, no deformities, or step offs. Plaintiff had no tenderness over the Achilles tendon. Bushnell ordered a single post cane for Plaintiff for one year, 15 mg of Mobic per day for pain, and size 13 insoles to reduce the pressure on the bone spur. *Id.*

On November 17, 2019, Plaintiff requested a medical appointment, reporting that his ankle was getting worse and that the bone spur felt like a nail when he walked. Dkt. 27-3, p. 9.

MEMORANDUM DECISION AND ORDER - 30

On November 26, 2019, Plaintiff saw Nurse Practitioner Anthony Reece. Plaintiff reported left ankle pain with walking long distances. Reece noted Plaintiff had "Achilles tendinitis." Dkt. 27-4, p. 27. Reece advised him to avoid strenuous use of the left ankle, foot, or Achilles tendon until the pain eased. He advised that symptoms usually improve with time if not overused. He told Plaintiff to warm up before exercising, improve the strength of the muscles around the ankle, use an ice pack, and lie down and place his heel on a raised surface to reduce swelling. *Id.*

On December 4, 2019, Worley saw Plaintiff regarding a request for a wedge pillow for "bad edema" and swollen feet. Plaintiff told Worley he was supposed to be wearing compression socks. There are no notes about a left ankle problem, only a discussion about the need for a wedge pillow to relieve his bilateral edema. Dkt. 27-4, p. 27. Worley examined him, noted no edema in his legs and that he was not wearing the previously-issued compression socks. She informed Plaintiff that a wedge was not clinically indicated at the time because he did not have any edema. She recommended he wear the compression socks because—even if he did have edema, which he did not— compression socks would best address that condition, not a foam wedge. This was the only time Worley saw Plaintiff for leg issues, and the notes specifically do not show that Plaintiff told Worley of any symptoms other than bilateral edema. *Id.*

On January 7, 2020, Plaintiff reported to Rogers that his left ankle was not really painful at all unless it was touched or he walked a long distance. He used a wheel chair for long distance travel, such as to the dining hall. Rogers opined that Plaintiff had "negative left Achilles tendon." Dkt. 27-4, p. 26. Rogers questioned a diagnosis of

"Achilles tendonitis vs. Ligament pain v. other subject complaint of chronic left ankle pain with otherwise negative objective findings." *Id*. Rogers referred Plaintiff to physical therapy, and Rogers wrote that he would consider an MRI if Plaintiff had no improvement with physical therapy. *Id*.

Plaintiff proceeded to physical therapy and was issued a walking boot for his ankle; after that, he had no other ankle complaints of which Worley was aware. Dkt. 27-3, p. 11. A physical therapist note of May 8, 2020, shows the Plaintiff had a "history of left ankle injury that had great improvement and recovery with PT." Dkt. 27-4, p. 22.

The foregoing course of events does not show that Worley was deliberately indifferent to Plaintiff's health condition on the appointment of December 4, 2019. Plaintiff alleges he *did* say that his request for a wedge pillow was for swelling due to the softball injury to his left foot, see Dkt. 29 p. 4, and not due to edema in both legs (as reflected in the medical record), and Worley simply ignored that statement. However, Plaintiff's grievance specifically says he wanted the wedge pillow "to prop my feet [plural] up—as a cheap and easy way to help my edema." Dkt. 23-7, p. 68. The grievance topic matches Worley's medical record to show what Plaintiff complained of on December 4, 2019. See Dkt. 23-7, pp. 67-68. A claim that Worley did not authorize a wedge pillow for his softball injury has not been exhausted in the administrative grievance system.

Nevertheless, regardless of whether Plaintiff complained of swelling in one or both feet, the objective symptoms during this appointment did not show that a wedge pillow was a medical necessity. Rather, Worley told Plaintiff that the prescribed

compression socks (that he was not wearing) were the proper treatment for bilateral edema.

Because Plaintiff has failed to bring forward facts supporting either the objective or subjective prong of the deliberate indifference test as to Defendant Worley's treatment of his ankle issues, she is entitled to summary judgment. Even if the physical therapist thought a wedge pillow might help, as Plaintiff alleges, the medical provider—who treats a broader range of Plaintiff's health issues—disagreed. Even if another nurse practitioner disagreed, nothing Plaintiff has pointed to shows that Worley's conclusion was medically unacceptable under the circumstances or was chosen in conscious disregard of an excessive risk to Plaintiff's ankle issues, especially given his comorbid hypertension and diabetes conditions. *See Toguchi*, 391 F.3d at 1058.

The Court next turns to the failure-to-provide-a-wedge-pillow claim asserted against Defendant Siegert. Plaintiff alleges Defendant Siegert was deliberately indifferent to his serious medical needs by "either ignoring the initial grievance altogether[,] dismissing the issue[,] or/and following deliberately indifferent policies of [Corizon]." Dkt. 3, p. 4.

Siegert reviewed not only Worley's treatment, but the other providers' treatment of Plaintiff's ankle and foot issues. Plaintiff's grievance complained that delays in treatment worsened his ankle injury. As the discussion above reflects, Plaintiff waited about a month for treatment. He then received continuous and varied care from the medical providers at the prison. Plaintiff had various foot, ankle, and leg medical conditions at issue that the providers considered. Plaintiff was not compliant with

wearing the compression socks, which might have helped with the healing of his softball injury early on. After a course of conservative treatment, with an emphasis on keeping both ankles healthy in the face of hypertension and diabetes, Plaintiff's injury healed.

Siegert was correct in determining that, once Plaintiff saw a medical provider for his ankle condition, his health care at the prison was appropriate, and in advising him that he should seek further help through the medical unit if his problem did not resolve. It did. Nothing in the record shows that Siegert was responsible for any delay in treatment. Siegert is entitled to summary judgment on the ankle/wedge pillow claim.

### 9. Eighth Amendment – Thumb and Wrist Issues

On or about June 18, 2020, Plaintiff asked for a wrist brace for a self-diagnosed relapse of left wrist carpal tunnel syndrome. On June 26, 2020, Worley examined Plaintiff's thumb and wrist and found nothing of significance. Worley ordered an x-ray and recommended that he take Tylenol and apply topical cream. He declined to take pain medication or use cream. He agreed to continue taking meloxicam, already prescribed to him for other symptoms. The x-ray showed osteoarthritis, also called degenerative joint disease.

On July 9, 2020, Worley saw Plaintiff for increased pain. She ordered a wrist brace for him, to be measured and dispensed in clinic by the nursing unit. Dkt. 27-4, p. 20.

On July 22, 2020, Plaintiff reported to the physical therapist that he had an increase in thumb pain, for no apparent reason. Ice did not help the pain. The physical

therapist encouraged him to use heat as needed, practice AROM (active range of motion), and attend physical therapy on July 29, 2020. *Id.*, p. 19.

On July 29, 2020, the physical therapist noted that the PROM (passive range of motion) to the CMC (carpometacarpal) joint was very limited and painful, and that she felt a clunk with small AROM at the CMC joint. She noted that she was unable to rule out a structural limitation at the CMC joint. She told Plaintiff to follow up with the medical provider for possible further imaging of his thumb. *Id.*, p. 19. She noted that he was waiting on the wrist/thumb brace ordered by nursing. *Id.*

On August 5, 2020, Plaintiff reported to the physical therapist that his left thumb was still very painful, that the contrast bath helped his range of motion, but that neither the bath nor the wrist/thumb brace was helpful for the pain. *Id.*, p. 18.

On August 12, 2020, Plaintiff reported to the physical therapist that his thumb pain decreased with resting, but began hurting every time he used it. He reported that he had a hard time getting ice on his tier because nobody knew where to find it. Dkt. 27-4, p. 18. The physical therapist submitted a request to Director of Nursing (DON) Gen Brewer to order a thumb spica splint to replace the left wrist brace. *Id.*, p. 18.

On August 19, 2020, the physical therapist noted that Plaintiff was waiting on the thumb spica splint she had asked Gen Brewer to order. The physical therapist noted: "CMC cont[inues] to be very restricted with either loose body or crepitus significantly limiting ROM with intense pain during joint accessory mobility testing. We have addressed gentle ROM, contrast heat/cold, light STM with no change in ROM and

worsening pain per patient. Nerve inflammation ruled out with no increase or change in pain with nerve glides." *Id*., p. 18 (verbatim).

On September 1, 2020, Worley saw Plaintiff for a follow up regarding the physical therapist's recommendations for a reassessment of the thumb for a loose object or crepitus. *Id*., p. 18. The physical therapist's latest report noted: "Inflammation is too acute to gain motion[;] therefor[e] F/U for inflammatory control is needed before we can proceed." *Id*. The physical therapist recommended an ice memo for three months and a CT image of the left thumb. *Id*.

Plaintiff reported to Worley that the physical therapist recently had ordered the thumb splint brace. He reported not having received any medical ice that had been recommended by the physical therapist. Plaintiff reported ongoing left thumb joint pain, left wrist pain at a level of 7/10 that was a constant deep ache, and difficulty using an electronic tablet due to increased pain. He said that "most pain medications don't work for [him] and not even Tylenol," and he reported currently taking APAP [which is the same as Tylenol] and naproxen for pain management. Dkt. 27-4, p. 18.

On September 4, 2020, Corizon's Utilization Management Team ("UMT") considered and "entered an ATP" (apparently, a denial is called an "ATP") on the physical therapist's recommendation for a CT scan. In her declaration, Worley explained that the UMT was a resource to help evaluate the medical necessity of testing and referrals. Worley also declared that she made her own independent decisions, implying that she could overrule the UMT's ATP. *See* Dkt. 27-3, p. 6. The reason given for denial of the CT scan was that it was not a medical necessity, given that Plaintiff had already

been diagnosed with degenerative joint disease, which warranted only conservative care. Dkt. 27-4, p. 7 (noted in a records review of 05/07/21).

On September 22, 2020, Plaintiff asked Worley about the thumb splint recommended by the physical therapist. Worley's note reads, "Per review of records PT coordinated with DON Brewer order splint." Dkt. 27-4, p. 17 (verbatim). On October 6, 2020, Worley made an entry in her medical records that she was "[r]ecommending nursing to clarify on status of brace." She continued the prescriptions for naproxen and APAP for pain. Dkt. 27-4, p. 17.

At some point between October 6, and November 18, 2020, Plaintiff received the thumb splint brace and also had one steroid injection in his wrist by nurse practitioner Rogers. *See* Dkt. 29, p. 13; Dkt. 27-4.

On November 18, 2020, Plaintiff had a follow-up visit with Worley. Plaintiff reported that he still had constant pain, worsening when the thumb moved. The wrist steroid injection was not effective in decreasing pain. Physical therapy has not been effective. Plaintiff verbalized irritation that the CT image was not approved and reported that he had initiated he Grievance process on denial of the CT scan. Plaintiff reported that he regularly wore the thumb splint brace (but he did not wear it to his appointment). Plaintiff reported that the APAP medication had not been effective in decreasing his pain and he requested that it be discontinued. He reported that the naproxen has been effective in managing his pain, but requested it to be prescribed as BID (twice daily) and not as currently prescribed as BID PRN (as needed up to twice daily). Dkt. 27-4, pp. 14-15.

Based on her evaluation, Worley suspected that Plaintiff had CMC (carpometacarpal) pain that was "due to DJD (degenerative joint disease) ongoing pain at left thumb." Dkt. 27-4, p. 15. She agreed that the APAP should be discontinued if it was not helping the pain; she recommended remaining on the naproxen, but educated him that he should "only take NSAID when needed and not as a standardized daily administration." *Id*. She discussed with Plaintiff that "it is indeed within his rights to pursue the grievance if he disagrees with a UM Team determination of an off site CT image consult that was ATPd." She recommended that he continue use of the left thumb/wrist brace to aid in pain management. Dkt. 27-4, pp. 14-15.

Worley's notes from the appointment of November 18, 2020, suggest that the UMT was responsible for denial of the CT scan and that she told Plaintiff he should grieve the UMT decision if he desired. In contrast, her later Declaration prepared for this litigation says that she "considered computerized tomography ("CT") imaging of Mr. Mintun's left thumb, but after "reviewing guidance through the UMT and [based on her] own medical opinion, [she] determined that the CT of the left thumb was not indicated at that time." Dkt. 27-3, p. 13. The reasoning was that "[p]rior imaging determined he had DJD (degenerative joint disease) and a CT scan was not likely to change the course of treatment at that time." *Id*. Regardless of whether the UMT or Worley actually was the final authority on the CT scan, Worley was the practitioner who denied the CT scan and Worley is the defendant in this action.

On December 11, 2020, Plaintiff saw Worley for follow-up on his thumb pain issue. Plaintiff reported: "The injury in my left hand is getting worse, I have lost almost

MEMORANDUM DECISION AND ORDER - 38

all use of it without severe pain." He also reported that "nothing so far decreased the

pain," including "ace-wrap, hand/thumb brace, topical analgesic creams, IBU, APAP,

naproxen, Kenalog injection, Physical Therapy HEP." He was, however, able to complete

all ADLs (activities of daily living) independently and work at the library regularly.

Plaintiff reported wearing the brace intermittently and using Ace wrap intermittently, but

they were not effective and "actually … increased the pain." Dkt. 27-4, p. 13.

Worley reported that Plaintiff told her that other inmates he knew were getting

more effective pain medication. Worley said she would not speculate what others were

getting, but she discontinued the naproxen and instead prescribed meloxicam (Mobic).

On January 23, 2021, in a visit with another practitioner, Plaintiff reported that the

meloxicam was not effective in treating his pain. The practitioner prescribed prednisone,

omeprazole, and diclofenac. Dkt. 27-4, p. 11.

On May 7, 2021, Worley spent a substantial amount of time documenting

Plaintiff's medical conditions. Dkt. 27-4, pp. 7-8. Plaintiff complained of back and left

upper extremity pain. Worley performed a records review and determined that, on

September 1, 2020, Plaintiff's request for a CT image of left thumb for ongoing pain had

been denied because, "[b]ased on the information provided, medical necessity not

demonstrated at this time. As diagnosis of DJD has been established, consider continuing

conservative care." Dkt. 27-4, p. 7. As a result of Plaintiff still having significant pain on

May 7, 2021, Worley questioned the cause of the pain: "Degenerative joint disease verses

Radial Styloid Tenosynovitis verse OA [osteoarthritis]." *Id*. (verbatim). She also

recommended an "Orthopedic evaluation LUE (left upper extremity) due to worsening

symptoms, decreased ROM, increased pain, now has failed conservative management."

*Id.* The UMT, however, recommended trying out different analgesics first. Dkt. 27-3, p.

15.

On June 16, 2021, Plaintiff was scheduled to meet with Worley to discuss the

status of further treatment for his wrist/thumb pain and to further discuss whether an

offsite orthopedic evaluation was appropriate. *Id.* Worley could not pursue that option

because after Plaintiff filed his lawsuit, he refused to meet with her to discuss the issue

any further. *See* Dkt. 27-3, pp. 11-16; Dkt. 29, p. 9.

Plaintiff has not brought forward sufficient evidence to show that Worley's

conservative course of treatment for his thumb and wrist, given his underlying

degenerative joint disease (DJD) diagnosis, was objectively medically unacceptable

under the circumstances, and was subjectively chosen in conscious disregard of an

excessive risk to Plaintiff's health. *See Toguchi*, 391 F.3d at 1058. Worley provided

Plaintiff with different pain medications; recommended conservative care techniques like

icing, physical therapy, and a wrist brace; further examined him when he continued to

complain of wrist pain to rule out other possible diagnoses, and requested an orthopedic

evaluation, which was to be performed if analgesics did not work.

Plaintiff did have an approximate one-month wait to obtain a wrist brace after

Worley ordered it. He also had an approximate two-month wait to obtain a thumb spica

brace after the physical therapist ordered it. The record makes it clear that the ordering of

such devices were the responsibility of Gen Brewer, the director of nursing. Worley

directed Plaintiff to follow up with Brewer about the delay in receiving the devices. The

record also reflects that neither device helped Plaintiff's symptoms significantly and the braces may have caused more pain. Thus, Plaintiff fails to meet the objective factor of his claim that he was injured by the delay in providing these devices, whether by Worley, Brewer, or the physical therapist.

Because Plaintiff has failed to meet either prong of an Eighth Amendment deliberate indifference claim, Worley is entitled to summary judgment on the thumb and hand claim.

The Court now turns to Siegert's role in evaluating Plaintiff's thumb and hand complaints. In November 2020, Siegert responded to Plaintiff's grievance contesting denial of the CT scan of his wrist and thumb. Siegert notified him that his providers determined that a CT scan was not medically necessary because he had been diagnosed with degenerative joint disease via x-ray, and the providers had recommended conservative treatment at that point. Dkt. 27-5, p. 8. Siegert encouraged Plaintiff to follow up with providers if his symptoms worsened. In accordance with the conservative medical treatment of Plaintiff's left wrist and thumb to that point, Siegert did not act in an objectively or subjectively improper manner that might equate to deliberate indifference when her review showed that Plaintiff's DJD was being treated conservatively. Worley did not recommend an orthopedic consultation for the thumb/wrist issue until half a year later, on May 7, 2022, which also shows that Siegert's actions before that date were appropriate. Summary judgment on this claim for Siegert is therefore appropriate.

### 10. Eighth Amendment – Eye Condition

In about 2014, Plaintiff had Bell's palsy that "was pretty severe," as he described it. Dkt. 27-4, p. 28. "The whole right side of [his] face was numb," and he thought he had suffered a stroke. *Id.*

In September 2018, Plaintiff complained to a prison medical provider (not Worley) that his right eye was watering and becoming more sensitive to light. On October 1, 2019, Plaintiff had a visit with the optometrist. Plaintiff communicated that his eyes watered and became blurry every time he chewed and he thought he might have nerve damage in his right eye. Dkt. 27-4, p. 30. The optometrist determined that Plaintiff's eyes were normal except for a finding of mild lagophthalmos in the right eye and "dry eye syndrome of right lacrimal gland." Dkt. 27-3., pp. 5-6. *Lagophthalmos* "is the incomplete or defective closure of the eyelids which can be caused by Bell's palsy, among numerous other causes." *Id.*, p. 6. The optometrist prescribed artificial tears and white petrolatum to moisturize the eye, and also referred Plaintiff to a prison medical provider for a "neural/cranial nerve evaluation because of symptom of chewing affecting [right] eye." *Id.*

On October 21, 2019, Rogers saw Plaintiff and determined that his complaints were likely residual effects of his prior Bell's palsy. Dkt. 27-4, p. 29. Rogers noted: "As this appears to be a chronic issue for pt. will refer for EMG/NCS testing R facial nerves to check for impairment." *Id.* Rogers sent the issue to the UMT for an opinion.

On October 23, 2019, the UMT decided not to recommend nerve testing because "the patient was previously diagnosed with Bell's palsy, and there have not been acute

changes to suggest a new cause of symptoms"; therefore, a "new workup would be unlikely to reveal new diagnosis." The UMT told Worley to "consider obtaining previous records if verification is needed." *See* Dkt. 27-4, p. 25.

On February 14, 2020, Worley met with Plaintiff for a follow-up on the eye issue. Plaintiff alleges that Worley refused to answer any questions about his eye. He tried to ask her why she thought his eye diagnosis was "dry syndrome," when it could be obvious nerve damage from Bell's Palsy, and why the optometrist's suggestion to have additional nerve evaluation done would not be appropriate. Worley's notes from that date show that Plaintiff expressed frustration about nothing ever being done in the medical unit, and he left the appointment prematurely. In this litigation, Plaintiff and Worley disagree about why she did not examine his eye condition or do something more on February 14, 2020: Worley said Plaintiff ended the appointment before an examination could be performed, while Plaintiff said that Worley said she had no need to examine him. It appears that Worley agreed with the October UMT recommendation. She wrote "Uphold ATP: please obtain Bell's Palsy records." Dkt. 27-4, p. 25.

There is no dispute that Plaintiff previously was diagnosed with Bell's palsy and that several different providers have opined that Plaintiff's current eye conditions likely a byproduct of Bell's palsy, given that Plaintiff had no new acute changes to suggest a new cause for his symptoms. Plaintiff argues that Worley overruled the optometrist who referred him to "OPC for neural/cranial nerve evaluation." Dkt. 29, p. 10. However, the record shows that the optometrist deferred to Plaintiff's medical providers on the decision on whether to obtain further nerve evaluation.

MEMORANDUM DECISION AND ORDER - 43

The UMT determined that testing was not likely to show any different causation, and Worley agreed. The appointment at issue was terminated prematurely, and Plaintiff has not shown that Worley had any further involvement in the eye treatment. For example, even though the causation may be Bell's palsy, there are no further records to show if prison medical providers offered any alternative treatments to counteract the diagnosed incomplete closure of the eyelids, which was in turn may have been causing dry eyes and excessive watering while he chewed; or whether providers determined that the problem was a Ball's palsy residual side effect that was not serious enough to treat with anything other than the eyedrops and petrolatum.

Plaintiff has, at various times, asserted that "the nerve damage … is causing me to steadily lose vision on my right eye" and that he may go "completely blind." Dkt. 27-6, p. 12. However, his optometry appointments do not support those assertions. In response to Plaintiff's grievance of February 24, 2020, the first level responder wrote: "You were diagnosed with Bell's Palsy. If you have vision problems, please submit an HSR." *Id*. On March 18, 2020, the second level responder reviewed his chart but incorrectly said that he had not submitted an HSR for eye concerns since 7/2019. *Id*., p. 13. On appeal, Siegert corrected this response and said that her review showed Plaintiff had an appointment about his eye with Worley on February 14, 2020, but the appointment ended early because of a disagreements, so that Worley was not able to offer him a medication she had intended to suggest. Siegert encouraged him to "meet with a provider and at least hear what they have to say[;] it may be beneficial and help with your symptoms." *Id*.

As to Worley, the Court concludes that Plaintiff has not brought forward sufficient evidence showing that Worley's decision to agree with the UMT providers—who determined that the eye issue was very likely a residual symptom of Bell's palsy and no further nerve testing was required—was objectively unreasonable. A disagreement between the optometrist and the UMT/Worley is not enough to show deliberate indifference. A disagreement between Plaintiff and Worley that ended the appointment prematurely does not provide sufficient evidence that Worley was subjectively deliberately indifferent to his eye condition. Because providing medical care in a prison setting poses inherent risks to a provider, she is permitted to interpret an escalating discussion during a prisoner's appointment as beyond her risk threshold without having to worry about being labeled deliberately indifferent. If this were not the case, it would be difficult to find medical personnel to work in the prison health care field. Nothing in the record suggests that Worley knew the course of action chosen for Plaintiff would result in serious harm and yet pursued it anyway. Worley is entitled to summary judgment on the eye care claim.

As to Siegert, Plaintiff has not provided evidence showing that Siegert was deliberately indifferent to his eye condition, given that the eye doctor, Worley, and the UMT all considered additional testing—in the face of a longstanding Bell's palsy diagnosis—as optional. Siegert appropriately reviewed the record and suggested that Plaintiff follow through with the medical providers to see if his watering eye could be helped by a medication. Siegert is entitled to summary judgment for lack of a showing of the objective or subjective factors necessary to proceed to a jury.

## STATE LAW CLAIMS

### 1.  Standard of Law

Title 28 U.S.C. § 1367 provides that a district court may exercise supplemental jurisdiction over state claims when they are "so related" to federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." In other words, the supplemental jurisdiction power extends to all claims that a litigant ordinarily would expect to be tried in one judicial proceeding. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

To state a claim for negligence, a plaintiff must provide adequate factual allegations showing the following: (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of the defendant's duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage. *Nelson v. Anderson Lumber Co.*, 99 P.3d 1092, 1100 (Idaho Ct. App. 2004).

For a patient to prevail on a medical malpractice claim, Idaho Code §§ 6-1012 and 6-1013 require that a plaintiff prove through "direct expert testimony" that the medical defendants failed to meet the applicable standard of health care practice in the community. If a plaintiff fails to do so, "the medical defendant is entitled to summary

judgment." *Eldridge v. West*, 166 Idaho 303, 312-13, 458 P.3d 172, 181-82 (2020) (*citing Mattox v. Life Care Centers of America, Inc*., 157 Idaho 468, 473 (2014)).[4]

### 2.   Medical Malpractice or Negligence - Worley

Plaintiff's state law claims fail because he has not shown that Worley committed medical malpractice or negligence in her care of him. Plaintiff must bring forward an expert opinion to establish the applicable standards of care in the community relating to Plaintiff's eye, ankle, wrist/thumb, and back *and* to establish that the defendant negligently failed to meet the standard. I.C. § 6-1012. Plaintiff must also show that the failure to meet the standard caused a particular injury. That is to say, unlike Eighth Amendment claims, state medical malpractice claims always require expert opinions for the elements of duty of care and breach of care, and almost always for causation. *See, e.g., Ledford v. Sullivan*, 105 F.3d 354, 359 (7th Cir. 1997) (contrasting the question of whether prison officials displayed deliberate indifference toward Ledford's serious medical needs, which did not require an expert opinion, with the question of medical negligence, which demanded that the jury consider probing, complex questions concerning medical diagnosis and judgment, which did need an expert).

The Court agrees that the medical malpractice claims and causative factors in this case are not ordinarily within the knowledge or experience of lay persons. If Worley committed medical negligence, it is not apparent from the face of the medical records.

---

[4] In addition, Idaho Code § 6-1001 provides for mandatory prelitigation screening by the Idaho Board of Medicine before a patient can bring a malpractice case involving claims for damages against physicians and surgeons practicing in the state of Idaho.

Therefore, summary judgment on Plaintiff's state law claims is appropriate for Defendant Worley.

### 3.  State Law Claims – Medical Negligence - Siegert

As discussed above, Siegert adequately reviewed the grievances at issue in this case. As to Plaintiff's state law claims, he must establish a prima facie case of negligence, including duty, breach, causation, and damages. The discussion above shows that Plaintiff has not brought forward sufficient evidence that Defendant Siegert breached any duty owed to Plaintiff in her limited capacity of reviewing prisoner grievances. Likewise, her decisionmaking—whether to point Plaintiff back to his first-responder providers for additional explanations or treatment or to seek the regional medical director's evaluative expertise—was reasonable under the circumstances. Siegert is entitled to summary judgment on the state law claims.

### CONCLUSION

All claims are dismissed for the reasons set forth above. Plaintiff's claims seem to have coincided both with Corizon's end of contractual medical services to the IDOC and the end stages of some of the courses of conservative treatment for his health conditions. Therefore, it may not be unrealistic for him to continue to seek from the new medical provider through the prison administrative grievance system additional or different care if the conditions are of a serious and continuing nature. However, there are multiple instances in the record showing that Plaintiff is not following his medical providers' instructions and advice; therefore requesting the same testing without following their

instructions would be futile. Medical care requires the cooperation of the patient with medical providers' advice, as does a successful Eighth Amendment claim.

The Court notes that obesity is not a condition for which individuals should be shamed or ashamed, but it is a medical condition in itself. The Constitution does not protect against medical providers' harsh bedside manners, especially when discussing life-threatening medical conditions such as morbid obesity. Nor is the Constitution interested in whether it was Plaintiff or the provider who sometimes ended prison medical appointments early due to a disagreement in the face of a lengthy medical chart reflecting that Plaintiff was receiving continuous care from several different medical providers. Overall, even though the advice about losing weight and exercising is not welcomed by Plaintiff, the record makes it clear that Worley and Siegert are concerned about Plaintiff's serious health conditions, especially his morbid obesity, and its effect on Plaintiff's other health conditions, including hypertension, diabetes, pain management, and even the continuation of his life.

If Plaintiff finds it difficult to lose weight, he may desire to seek psychological counseling, attend an addiction group, or study addiction materials. He may also desire to seek weight loss help from his medical providers. There are many alternative pain relief and mind-and-body-control aids that are becoming mainstream recommendations from mental health and medical providers, such as mindfulness, meditation, and intermittent fasting. Plaintiff cannot disregard reasonable and appropriate medical advice from many different providers and forgo remaining conservative treatment options.

## ORDER

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 27) is DENIED on the statute of limitations defense and GRANTED on the merits. This entire case will be DISMISSED with prejudice.

DATED: January 31, 2023

B. Lynn Winmill
U.S. District Court Judge